Good morning, Your Honors. My name is Howard Davis. I represent the Petitioner and I am the DAMBAKOV. May it please the Court. One of the things that I find particularly troubling about this case is the judge's decision in about 2000, if I remember correctly, and then about a year later the judge writes a written decision, and that for the first time brings up a number of issues, first of which I think are the two main issues in this case, which are credibility and the persecutor issue. Did he give the Petitioner an opportunity to explain the defects he found, you know, the omissions between the application for asylum and the testimony, as well as the conflict with the expert testimony, between the expert testimony and DIAMBAKOV's story? Did he get – was there not – since the testimony closed, and then he – a year before he made his decision, was there an opportunity to explain? The short answer to that is no. In the – in the written decision, there were – there was a number of questions about, as Judge Wardlaw mentioned, the discrepancies or the alleged discrepancies between the I-589 application and the testimony. And nowhere in the record the judge was conspicuously quiet on anything having to do with these discrepancies during the hearing, nor did the judge – nor is there nothing in the record to show that even in light of the judge's concerns over a year later, did – was there an attempt to reopen the testimony for questioning. And I would also say that there was one thing that the judge pointed to as a discrepancy, which is, in fact, not a discrepancy, and that was a judge said, well, in the I-589 there was no mention of an assassination attempt, yet in his testimony he talks about being in an automobile with an assassination attempt. But if you look at the record at page 295 of the administrative record, which is in the very bottom of the – of the I-589 at that page, the last sentence talks about an assassination attempt. It doesn't go into a whole big to-do, but at least references it. Also, with regard to the – there's just a lot of conjecture as well. I mean, there's a whole section of the judge's decision in which he poses several questions about the – about the – just the thinking behind the Sky Toplia and the KGB and all this, and not once did he pose any of those questions. And the judge certainly had the application in front of him beforehand. He didn't ask Mr. Cutler, the expert witness, to – to ask about that, nor did he ask Mr. Demikoff.  Scalia. May I ask you one preliminary question, because it will help with the shape of the argument? The BIA decision is based on – solely on the adverse credibility finding. In view of that, is credibility the only issue that we can properly decide in this case? Do we have to remand all other issues? I would say that I think – I'd say the issues to be remanded, in thinking about what is to be remanded, certainly the persecutor issue. That was – that was also something that was never brought up during the hearing, nor was it even asked about by the trial attorney. Persecutor issue? Yeah. Whether or not Mr. Demikoff is statutorily barred for being – for assisting, aiding in the persecution of others. And that was the – one of the first things that the judge talked about in – in his decision, as a statutory bar. And it certainly – Well, wouldn't we have to just say we – we – if you were to prevail on this appeal, would we not have to just say we reversed the credibility finding and all other issues are remanded to the BIA? I would – definitely, if credibility is to be reversed, definitely has to be remanded for the basic asylum issues of past persecution and well-founded fear. Taking his testimony is true this time. Yes. And then – and then, okay, but you're all – Judge Reiner, you also asked about what about the – the aiding and abetting and the persecution issue. I – No, I really didn't. I just asked, wouldn't we just say, if you were to prevail, that we reverse the credibility finding, since that's the only thing the BIA did, and remand the case to the BIA? For further consideration on everything else, since the – since the board didn't really address any of that stuff. Didn't present anything else. Yes. I think under Ventura, the Court would probably have to do that. Okay. What's the name of this country? Well, are you referring to Ossetia? Yes. Well, that – yeah, I think Ossetia is kind of – this is – there was North Ossetia, I think was a breakaway from Georgia. But Mr. Demikoff himself, of course, is ethnic Ossetia. The question was how do you pronounce it. Oh, yeah, I know. I went – now I'm going beyond the Scottish question. Yes, you are. Right. I'm aware of that part. I just want to know how to pronounce the country. That's the way I've been pronouncing it. That's – I've been pronouncing it Ossetia. Now, my more Russian-speaking friends might disagree on that point. All right. So now let's get back to credibility. So that's the issue for us, is whether your client was – Okay. So in – and really, the judge didn't confront or didn't really discuss any of the concerns. The other thing that the judge mentioned that, okay, as a fallback, since there's problems with the testimony, the judge referred to this Court's case, Sithu, and saying that, well, he should now let's – he should have corroborative evidence. My concern there is that, yes, the judge cited Sithu, but Sithu also stands for the proposition that you have to, A, confront the individual or ask the individual about his ability – about the obtaining of corroborative documents and provide that person an opportunity to explain why he didn't get it. Secondly, it stands for the proposition, and this is very much of relevance in this case, the judge was saying, well, we don't have any letters, affidavits or whatever from anybody talking about Dembekov's family relationship to the former President of North Ossetia, and that he didn't have any letter or affidavit saying that he had worked in April of 1997 training the bodyguards for this guy. And these are precisely the sorts of things that the Sithu Court said that it's probably not reasonable to expect. These are the sorts of things that would be precisely be difficult to obtain. So – – lack of credibility. My – I think that – I think in – I think Sithu dealt with an issue where there is that if the – I think it's only really in a type of situation where the Court is finding lack of credibility in the testimony. I mean, you don't necessarily need in the law of this circuit to have corroborative evidence as being the bulwark for a positive credibility finding. But whether – Right, if he's found to be credible, you don't need corroboration. But how do you – I mean, you don't know that he's not found credible. I'm sorry? You don't know that he's – that there's going to be an adverse credibility finding until it happens. Correct. So as a practical matter, even though the lack of corroboration cannot be determinative of credibility, it's helpful to have – It – yes, it is helpful. But again, one has to confront – if the Court is concerned about the lack of corroborative evidence, the Court at least has to confront or ask – somebody has to ask about the person's ability to at least try to get it. The BIA said that the respondent has not meaningfully addressed the immigration judge's adverse credibility finding. What do you take that to mean, meaningfully addressed? Is there – it appears that he was pro se before the BIA. Yes. And that – and I – in looking over the BIA brief, Mr. Demikoff was pro se. And I have to – you know, I have to say, I mean, that there wasn't much, if any, discussion about the credibility issue. And I think that if he had been represented, that would have – an attorney, a competent attorney would have zeroed in on that as the first thing. I think that – I think that the Court – this Court has given a certain amount of leeway with regard to pro se applicants. By the way, none of the briefing was this made an issue, that when this was brought up in the Petitioner's brief, Respondents did not say, hey, you failed to exhaust. I mean, that was certainly not an issue before this Court. But I think that there are cases that – the Ninth Circuit has a number of cases, certainly in the past year or so, that talk about the sort of the – the administrative agency has to do a little bit extra where you have a pro se. Well, I don't think it's raised here as a study agency. I don't think they're making a failure to exhaust claim. Maybe I'll hear differently when they argue. But certainly looking at the index to the brief, maybe I – Well, I don't understand the meaningfully addressed. I mean, was it addressed or not? I mean, I'll ask the BIA. The – but certainly the Board has a duty – the Board certainly has a duty to look at the record. I mean, has an independent duty to look at the record with regard to the whole decision. Maybe I missed this in looking – in looking through Respondents' brief, but I – just to my reading, I did not. You have a minute – oh, no, you're not. You're over already. I'm sorry. We'll give you your non-existent time of rebuttal. Okay. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I'm Allison Drucker representing the United States. First, I want to say that I agree with what's been said, that the asylum issue here, the adverse credibility issue, is, in my opinion, the only issue that's properly before the courts. The immigration judge decision really denied asylum withholding and cat protection on three grounds, it appears to me. One was the persecutor bar. One was that there was no connection to an enumerated ground under the Act. And then third, adverse credibility. Can I ask you a question about the persecutor bar? How does that play into each of the decisions that the Board makes? Is it a bar to bringing the claim at all, or is it – see, I'm questioning whether we really just look at adverse credibility or whether we also have to look at the decision that he was barred as a persecutor and decide that decision even before we would send it back if we were to decide to do that for adverse credibility. Yeah. I agree. It's a somewhat murky area. I think my suggestion is that the best reading here is, I mean, the Board would have to grab a handle with the issue first and decide, okay, you know, applying the law to the facts of this case, do we think that the bar applies here? And they didn't do that in this case. The immigration judge, you know, discussed the bar, and then the BIA just didn't say anything about it. They only talked about the adverse credibility issue. Right. But I was wondering if the bar plays into – because they go on and say, nor has he challenged the denial of voluntary departure, so I'm wondering if the bar plays into the voluntary departure determination, and where – in which part of the decision is it? Yeah, that's a – well, I mean, at least nominally, it applies to the asylum, you know, and I suppose it might also affect the good moral character aspect for voluntary departure. But I took – I took the Board's decision just to mean that he hadn't raised – you know, he hadn't challenged in his notice of appeal, I guess a brief – more specifically, brief to the Board the denial of voluntary departure, so they considered that that wasn't – before then, it didn't address it. All right. Do you want to talk about credibility now? Sure. Yeah, one thing – I want to make a kind of a, I'm sure, unusual suggestion here, and I guess that is that it seemed to me, reading the briefs of both parties, that people, you know, went off in a lot of other directions and briefed a whole lot of other issues, not exclusively focusing on the adverse credibility. And I just wonder if it would be helpful to the Court to have supplemental briefing that would be restricted only to that issue. And I just – I throw that out as a suggestion. Okay. Well, we'll consider that. And if we need any additional briefing, we will notify the parties. The reason for the adverse credibility determination seems to me had several different threads to it. There certainly was a mention of inconsistencies. Inconsistencies that were material that went to the heart of the claim here. This is a person who's claiming that the KGB, or I guess the successor to the KGB now, the Russian security police, are after him. His life is in danger. And yet, he – in his asylum application, he talks about being detained, abused, having his belongings searched, his telephone tapped, somebody trying to kill him. But he doesn't discuss these things and flesh them out in his testimony. By the same token, going in sort of the opposite direction, in his testimony on cross-examination, he talks about an incident in which a car he was in was shot at and his friend's wife was actually killed. A pretty major and traumatic event, one would say. It was certainly, I would consider that terrifying. But this wasn't mentioned at all in his asylum application. Well, what does it mean in his asylum application when he said they tried to assassinate me? Well, he doesn't – he doesn't tie it up with this particular incident and say that, you know, someone was actually killed at this time. So your complaint isn't that he didn't mention that they tried to kill him. It's that he didn't give the details in the asylum application. Well, it's not clear that it's even, you know, the same episode that he's alluding to. You mean you think there's more than one episode of their – I don't know what – I'm not sure what he was – I'm not sure what he was – you know, what he had in mind here. But it would seem to me if you thought somebody was really trying to kill you and they killed somebody else instead, you would be very eager to discuss that and be really forthcoming about it in an asylum application, that that would be, you know, the center of your whole presentation. And that wasn't the case. There's also a big question, I think, about the plausibility of the whole story about the KGB and the KGB asking him to spy and the fact that, you know, nothing much seems to happen to him when he refuses. I mean, again, the KGB is a pretty fearsome group of people and the story doesn't seem to hang together very well in terms of somebody who's coming and claiming that they're in fear of their life. You know, what he describes doesn't seem to rise to that level and wouldn't, you know, incite that kind of subjective fear, it would seem. I mean, his narrative is that after, you know, ten years of separation, a powerful officer in the Russian security police reminds him of an agreement that he signed previously to work for the KGB and this officer threatens to expose the petitioner if he refuses to do so. If, in fact, the petitioner was exposed, it would ruin this job offer where he's supposed to be going and training the bodyguards of the president of Ossetia. Okay, so it would undermine the job offer, it would disgrace him in the eyes of his family because he claimed that the president of Ossetia was some sort of family connection or relative and target him for possible harm since there's a lot of, you know, political conflict between Russia and Ossetia. They're seeing Ossetia as a, you know, forbidden separatist movement. Despite the fact that this pretty scary organization is trying to get him to do something and threatens him, he refuses and he even threatens to expose the officer. I find this hard to believe. I mean, I think, you know, somebody like that, if you threaten them, hey, they could, you know, break your thumb, break your knees, have you shot? Actually, the threat was he got angry and said that I might get the fate of the deceased journalist that used to cooperate with him in the past but decided either to quit or to disseminate some sensitive information through the mass media. And then he came back again and he was warned to move away from Russia. Okay. But what happens? I mean, what ultimately happens to him? He's definitely, he's definitely, he's definitely threatened. But even though he's beaten up, knocked unconscious, assaulted, and warned in that beating. Well, he's beaten up. I mean, after he, beforehand he's threatened, like, if you don't help us out, you don't go spy on the president of Osatia. But even during the beating he says he, that they mentioned the name of this powerful agent, as you call him, and they told him, you know, they connected the beating to his refusal to cooperate with the agent. Well, if they wanted him to cooperate, what they wanted him to do was to spy on the president of Osatia while he was training the bodyguards. But they don't seem to do anything to him, you know, to try to get him to do that just before he's going to go do it or while he's there doing it. They only do something to him afterwards when he doesn't have an opportunity to spy anymore. So I don't find that this story, you know, hangs together very well. Well, there are two problems in all of that, and that's why it's all speculation. One, whether the Russians, this powerful group of secret agents, would feel as comfortable carrying out their revenge in Osatia as they would in Moscow. Maybe, you know, I don't know whether they operate Wait a minute. That's the first. The second is you assume that if they didn't succeed in getting him in his one month period in Osatia to spy, that then they've completely failed and there's no reason they would continue their effort to persuade him to do that in the future. And I don't know why you would assume that they would give up on this effort just because they failed to get him to do it in his first one month visit. Okay. Well, my answer, okay, so the first part is, okay, if they want him, what they want him to do is spy on the President of Osatia. I mean, he's only going to have, like, this one month window or something when he's going to be there training the bodyguards. Otherwise, he's not there. Otherwise, he's in Moscow as a stuntman or something, right? Isn't the President related to him in some way? Yes. He says that. So why do you assume he's never going to go back to Osatia, that he couldn't go back and do more training? I'm not saying that he never could, but, I mean, he never has before. Ten years have passed, and he's never done it. He just, you know, he gets this invitation, and he's going to go do it. And that's how come the KGB is interested. But he has family in Osatia. His relatives are there. Let's assume they did enlist him. Mm-hmm. It would not be very difficult for him to go back to Osatia and resume his relationship with his family and serve as a spy. Well, I guess he could. You know, all your analysis shows is that it may or may not be a very – the way the KGB operates. Mm-hmm. I don't know that anybody's an expert in that. Was there any evidence offered that this is not consistent with the KGB's method of operation? I don't think anything specific, Your Honor. Anyway, I also just want to point out that also, you know, despite the fact that he apparently was very much in displeasure with these people, he was able to leave Russia with a passport and a visa, no problem, which also doesn't, you know, support his contention that these people were really after him and extremely  And, of course, this whole area of adverse credibility is reviewed under the substantial evidence test, so that if there's more than one way to read the record, the Court should be affirming the reading of the BIA and the immigration judge here. I think I'm over time. Yes. Thank you very much, counsel. Okay, just a couple of things. First of all, with regard to the question about the lack of meaningful addressing by Mr. Demikoff in his appeal, it says in page 2 of the record, the BIA decision, the board mentioned there was no meaningful addressing of the adverse credibility, but then it goes on to say that we find the adverse credibility finding adequately supported by the record. So they make their own, their independent finding, regardless of what he raised or didn't raise. Secondly, on page 117 of the record, which is the judge's, last page of the judge's decision, he did tie the denial of voluntary departure to the finding him to be, having been a persecutor. With regard to the KGB's behavior of people like Mr. Demikoff, there was some questioning of Mr. Cotler, the expert on this, and I just refer the Court's attention to pages 164, 165, et cetera, around that area, talking about the various types of treatment that he meted out. With regard to the fact that in 295 of the asylum application, Mr. Demikoff didn't go into a whole big thing about the assassination attempt. What I think Judge Reinhart was pointing out was that what we basically have is a less than perfect I-589, which in a case like Akinmati, this Court does not require. And anyway, that's, I think I've come. Thank you, counsel. The case just argued will be submitted. Next case, the oral argument. And it's the United States v. Cotler. Thank you.
judges: Reinhardt, Hall, Wardlaw